**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **DENISE ANSELMO,** | : | **CIVIL ACTION** |
|  | : |  |
| *Plaintiff,* | : |  |
|  | : |  |
| **v.** | : | **No. 18-5160** |
|  | : |  |
| **CITY OF PHILADELPHIA, ET AL.,** | : |  |
|  | : |  |
| *Defendants.* | : |  |
|  | : |  |

**MEMORANDUM OPINION**

Goldberg,  J.                                                              January 29, 2021

Plaintiff Denise Anselmo brings this lawsuit for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq., the Pennsylvania Human Rights Act, 43 Pa. Stat. § 951, et seq., and the Philadelphia Fair Practices Ordinance, Philadelphia Code § 9-1101, et seq.  She has sued her employer Defendant Philadelphia Police Department and two Philadelphia Police Officers, Defendants Captain Mark Burgmann and Sergeant Colleen Michvech (collectively, "Defendants"), alleging both retaliation and failure to accommodate arising out of two-year series of events.

Defendants have moved for summary judgment on Plaintiff's entire Complaint.  For the following reasons, the Motion will be granted, and judgment will be entered in favor of Defendants on all claims.

I.     **UNDISPUTED FACTS**[1]

 A. <u>General Background</u>

  The following undisputed fact section is detailed and lengthy.  Because I am granting judgment in favor of Defendants, I have attempted to lay out all facts upon which Plaintiff relies in opposing summary judgment.

  Plaintiff entered the police academy in August 2008, and began working as a police officer at the Philadelphia Police Department ("PPD") on February 9, 2009.  (Pl.'s Opp'n Summ. J., Ex. A, Dep. of Denise Anselmo ("Anselmo Dep."), 16:10–14; Defs.' Mot. Summ. J., Ex. A.)  On June 5, 2014, Plaintiff transferred to the Special Victims Unit ("SVU"), where she was responsible for investigating sexual crimes and crimes involving physical abuse of adults or children.  She handled a large caseload and managed all aspects of the cases.  (DSUF ¶¶ 2–5; PR ¶¶ 2–5.)

  Defendant Captain Mark Burgmann was assigned as the head of SVU on March 21, 2016.  Plaintiff described her relationship with him as "nonexistent."  She characterized him as "tough" and "cold," and she claimed that he "made the place feel like a dictatorship."  (DSUF ¶¶ 11–16; PR ¶¶ 11–16.)

 B. <u>Plaintiff's Discrimination Complaint</u>

  While working at SVU, Plaintiff alleged that a supervisor, Lieutenant John Hewitt, treated females unfairly as compared to males.  After experiencing a series of incidents with him, Plaintiff was encouraged by another supervisor, Lieutenant Smith, to file an internal complaint pursuant to the Equal Employment Procedure of the PPD.[2]  Her internal complaint was submitted in March 2016, during

---

[1] References to the parties' pleadings will be made as follows:  Defendants' Statement of Undisputed Facts ("DSUF"); Plaintiff's Response to Defendant's Statement ("PR"); and Plaintiff's Statement of Undisputed Facts ("PSUF").  To the extent a statement is undisputed by the parties, I will cite only to the parties' statements of undisputed fact.  If a statement is disputed and can be resolved by reference to the exhibits, I will cite the supporting exhibit or exhibits.  I will also cite to the supporting exhibits in the event further clarification of a fact is required.

[2] That Procedure prohibits "[a]ll members of the Philadelphia Police Department . . . from engaging in any act, action, or course of conduct which is discriminatory, and based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability (or a perception

Captain Burgmann's first week at SVU.  Captain Burgmann assisted Plaintiff with completing and forwarding the complaint to Internal Affairs.  From that point forward, Plaintiff had only five to six other interactions with Captain Burgmann while at SVU.  (DSUF ¶¶ 8–10, 17, 19, 21; PR ¶¶ 8–10, 17, 19, 21.)

As a result of her internal complaint, Plaintiff claims she was ostracized and lost friends at work.  She was not invited to social gatherings, co-workers would not sit near her, she was excluded when lunch was being ordered, co-workers would "banter" about her and indirectly call her a "rat," and none of her co-workers would investigate her cases with her.  Plaintiff did not report any of these allegations but simply began to "withdraw."  (DSUF ¶¶ 22–28; PR ¶¶ 22–28.)  As she was tired of the bullying, she kept to herself and typically "worked with [her] Air Buds on."  (Pl.'s Opp'n Summ. J., Ex. D, Affidavit of Denise Anselmo ("Anselmo Aff.") ¶ 6.)

One of Plaintiff's supervisors, Sergeant Joseph McEntee, testified that Plaintiff had "an attitude," "really didn't get along with her co-workers," and "never volunteered to help other people in their jobs but expected people to help her."  (Defs.' Mot. Summ. J., Ex. F, Dep. of Sgt. Joseph McEntee ("McEntee Dep.") 43:20–22; 44:12–19.)  Another co-worker, Lt. Myesha Massey, remarked that Plaintiff's squad "didn't particularly care for her" and would say that "she's the worst investigator."  (Defs.' Mot. Summ. J., Ex. G, Dep. of Lt. Myesha Massey ("Massey Dep.") 23:3–8.)

**C.     Plaintiff's Transfer Request**

In December 2016, Plaintiff applied for a transfer to the Major Crimes Unit and Background Investigation.  Generally, to obtain a transfer, a police officer prepares a Career Development Transfer request form, which is then completed by his/her supervisor and forwarded to the Commanding Officer.  The Commanding Officer then completes his/her portion of the form by checking "Highly Recommended," "Recommended," or "Not Recommended"  and funnels the form to the Transfer Review

---

of such disabilities), marital status, familial status, genetic information, or domestic or sexual violence victim status or because of an association with a member of any of these protected classes."  (Defs.' Mot. Summ. J., Ex. C.)  The Procedure also prohibits retaliation against an individual who opposes any unlawful employment practice.  (Id.)

Board. The Transfer Review Board interviews the officer and makes a final decision. (DSUF ¶¶ 32–38; PR ¶¶ 32–38.)

According to Sgt. McEntee, Major Crimes is a tough unit to get into because there are "not very many spots." (McEntee Dep. 15:18–22.) Plaintiff claims that her transfer application was delayed or denied by Captain Burgmann in retaliation for her complaint. (Anselmo Dep. 87:15–89:8, 91:5–20.) Specifically, when Plaintiff inquired into her transfer, she heard that Captain Burgmann was holding up her paperwork or just not giving her good reviews. (Id.) Captain Burgmann testified that he approved Plaintiff's transfer to the Major Crimes Unit. (Defs.' Mot. Summ. J., Ex. E, Dep. of Mark Burgmann ("Burgmann Dep.") 17:3–8.)

### D.      The Onset of Plaintiff's Symptoms and the New Year's Day Parade

Beginning in June 2016, Plaintiff began experiencing tingling in her feet, numbness in her legs, periodic leg muscle weakness, and stinging on the side of her back. (DSUF ¶¶ 43–45; PC ¶ 43–45; Anselmo Dep. 106:13–16.) Although she did not know the cause of her ailments, she worked through the symptoms, and her attendance at work was unaffected. In June 2016, Plaintiff's primary doctor told her to track her symptoms. Plaintiff spoke with Sergeant Vessay at the PPD about her feet "burning," and Sgt. Vessay shared that he had experienced similar symptoms and believed it to be "planter's foot." (DSUF ¶¶ 46–53; PC ¶¶ 46–53.) Captain Burgmann testified that he was not aware that Plaintiff was experiencing or seeing doctors for these problems. (Burgmann Dep. 17:13–23.)

At the end of December, the 2017 Philadelphia New Year's Day parade was approaching. This parade, like other special events, required that all officers work because "parade details" demand additional manpower to patrol the crowd. (DSUF ¶¶ 56–57; PC ¶¶ 56–57.) Around that time, Plaintiff had been experiencing a "delay in [her] right leg and [she] could not feel the ground under [her] feet." (Anselmo Dep. 151:13–17.) She went to her primary doctor, who was still trying to figure out "what was going on," and told him she did not think she could work the parade detail. (Anselmo Dep. 152:6–11.) Her doctor advised her against working the 2017 parade and prepared a note, dated December 30, 2016, stating, "[Plaintiff] was seen today. She may be excused from full duty 1/1/2017. She may return to

work 1/3/16 [sic] without restrictions."[3]  (Pl.'s Sur-reply, Ex. M.)  Plaintiff gave the note to one of her

supervisors, either Sergeant Vessay or Sergeant Ryan.  (Pl.'s Sur-reply, Ex. L; Anselmo Dep. 153:5–

154:2.))

On the eve of the parade, Plaintiff emailed Captain Burgmann's aide and told him, "I don't think

I'm going to be able to do the detail or whatever, maybe you can get somebody to fill it out.  I don't know

what's going on.  I've been checking on YouTube.  I don't know if it's a herniated disc, sciatic nerve, I

don't know what it is, but I'm going to go to my other doctor, I have another doctor appointment and I

will provide a note."  (Anselmo Dep.156:3–12.)  Ultimately, Plaintiff used sick leave and did not work

the parade detail.  (Id. at 154:3–13.)

When Plaintiff returned to work, Captain Burgmann "berated and humiliated" her and ordered

her to see the police doctor because her email claimed that she had either a herniated disc or sciatic nerve.

(Id. at 154:14–156:15.)  Sergeant McEntee gave her an injury form to fill out, and she initially refused,

insisting she was not injured at work.  (Id. at 156:13–24.)  The Captain told her she could not go back to

work unless she saw the police doctor because, based on the information he received, he believed Plaintiff

may be unable to wear a holster, meaning she was not fit for duty.  (Burgmann Dep. 26:20–27:3.)  Captain

Burgmann further advised her supervising lieutenant that Plaintiff would have to be "carried" on sick

leave until she was cleared by the PPD doctor.  (Id. at 27:23–28:6.)

Plaintiff filled out the "Accident, Injury & Illness" Report as required and listed her condition as

"muscle spasm lower back."  (Defs.' Mot. Summ. J., Ex. J.)  She then went for an evaluation with the

PPD doctor because she understood that it was the only way for her to get back to work.  When she

---

[3]    In her sur-reply brief, Plaintiff attached, for the first time, two exhibits: (1) an office visit
summary for December 30, 2016, and (2) the December 30, 2016 note from her doctor.  (Pl.'s Sur-reply
Br., Exs. J and M.)  Defendants now move to strike both of these exhibits because they were not produced
during discovery and Defendants could neither question Plaintiff about these documents or address them
in either their Motion for Summary Judgment or their Reply brief.  Plaintiff responds that there is no
prejudice and the exhibits simply confirm her testimony.
        Plaintiff's failure to provide these documents during discovery is inexcusable and would
ordinarily preclude Plaintiff from relying on them to oppose summary judgment.  However, as I find that
my consideration of these documents does not alter the outcome of my decision, I will not strike them for
purposes of my review of the case.

arrived, the doctor told her she did not need further evaluation and that a note from any medical doctor would suffice.  (Anselmo Dep. 159:4–12; Burgmann Dep. 26:24–27:3.)

Upon her next return to work, Plaintiff testified that she was called into Captain Burgmann's office where the following ensued:

> I'm in the office with [the Captain] and Lieutenant Lloyd and he said you called FOP [Fraternal Order of Police].  I said yes.  And he said well, you told Dawn [the Captain's aide] that you had a herniated disc.  I said I didn't tell Dawn that.  Then he presented the e-mail and said yes, you did, it's right here.  I said okay, but I also said that I was YouTubing things.  I said I can't diagnosis myself, captain.  He said you had a herniated disc. That's just what he stuck with.
> . . .
> And then he kept saying it and then he said well, you took off on a detail and you can't be—I can't have people taking off on a detail.  I said but I brought two doctor notes and I thought that would suffice.  And then he said you said you had a herniated disc and he just kept sticking with that. It's like no matter what I said to him it didn't matter.

(Anselmo Dep. 159:14–160:7.)  Plaintiff believed she was being berated because "he intimidate[d] [her]" and he only cared that she called out for parade duty and not that she had some condition that needed to be checked out.  (Id. at 160:10–14.)

Plaintiff alleged that this last-minute change in her work schedule resulted in her forfeiture of overtime pay on the day she had to see the PPD doctor.  Specifically, although she was on the 3:00 p.m. to 11:00 p.m. shift, she had gone into court that morning and should have been paid overtime for that court appearance.  When she came to work that evening, however, Captain Burgmann directed that the court time be her "work" so that she could take off for medical leave and see the PPD doctor.  (Id. at 161:13–163:22.)

## E.    Plaintiff's Diagnosis

In March 2017, Plaintiff was diagnosed with Multiple Sclerosis ("MS").  Around that time, she had a conversation with Lt. Smith, about it, and he said, "If I were you, I would keep this under my . . . you know how the department is."  (DSUF ¶¶ 80–82; PC ¶¶ 80–82.)  That was the last conversation she had with him about it.  (Anselmo Dep. 119:3–7.)

Plaintiff testified that she also revealed her diagnosis to Sgt. Colleen Michvech, who was transferred to SVU on January 18, 2017.  (DSUF ¶¶ 76–77; PC ¶¶ 76–77.)  After Plaintiff received her MS diagnosis, Plaintiff described to Sgt. Michvech the incident with the New Year's parade, and Sgt. Michvech responded "yeah, they told me all about that stuff before I got here."  (Anselmo Dep. 170:15–171:4.)  When Plaintiff revealed her diagnosis, Sgt. Michvech was "dismissive."  (Id. at 171:20–173:14.)  Plaintiff claims to have told Sgt. Michvech about the numbness in her legs during a separate conversation, but admitted that she did not say the symptoms were exacerbated when she had to work detail.  (Id. at 124:14–125:11.)  Sgt. Michvech testified, however, that Plaintiff never told her about the MS diagnosis, and that Plaintiff would talk about her CrossFit, so there was no time that she thought Plaintiff needed any kind of medical help.  (Defs.' Mot. Summ. J., Ex. L, Dep. of Colleen Michvech ("Michvech Dep."), 17:6–17, 36:7–16.)

According to Plaintiff, she masked the fact that she had MS because she did not really want to accept it.  (Anselmo Dep. 127:7–1.)  Plaintiff admits that she never told Captain Burgmann because she "didn't think he cared" and she "figured Lieutenant Smith or Sergeant Michvech would have told him."  (Id. at 125:16–23; see also id. at 119:8–14.)  Plaintiff knew that she needed to go to human resources, but she did not know that she was entitled to accommodations until she spoke with her lawyer at her doctor's office.  (Id. at 119:18–120:10.)

**F.**     **Plaintiff's Transfer Request to the Background Investigation Unit**

In September 2017, Plaintiff applied for a transfer to the Background Investigation Unit.  (DSUF ¶ 89; PC ¶ 89.)  Captain Burgmann checked off "recommended" on the transfer request form and noted that "[t]he applicant has performed her duties in a satisfactory manner.  She has used 56 sick hours since 1-1-17.  There are no disciplinary issues with [Plaintiff].  [Plaintiff] would be a good fit for the Recruit Background Unit.  Suitable replacement is requested."  (Defs.' Mot. Summ. J., Ex. M.)

Plaintiff testified that she believed Captain Burgmann interfered with her transfer request because the staff inspector with whom she interviewed said that he had not heard anything.  (Anselmo Dep. 91:5–10.)  She then spoke with Sergeant Jason Reid, who was friends with the captain at the Background Unit,

and he said that the SVU was "holding up her paperwork or they're just not giving good reviews." (Id. at 91:12–16.)

G.    **Investigation of Plaintiff's Sick Use in 2018**

Pursuant to the Department's sick policy, an "[e]mployee must remain at their residence or place of sick confinement until returning to duty. This will include regularly scheduled days off when preceded and followed by a day of absence for sick leave." (Defs.' Mot. Summ. J., Ex. N at 11.3-3.) Employees are subject to "sick checks" wherein a supervisor checks in on the employee at where he or she resides or the place of sick confinement. (Id. at 11.3-6.)

Late one night in January 2018, Plaintiff got a flat tire while driving home. The next morning, she called Sgt. McEntee and said, "I have a flat tire, I need to take off sick." (DSUF ¶¶ 91–92; PC ¶¶ 91–92.) Knowing that she would get sick checked, Plaintiff told Sgt. McEntee, "I am not sick, so I have to get my tires fixed and if I get sick checked, I'm not going to be here." (DSUF ¶ 95; PC ¶ 95; Anselmo Dep. 191:19–22.) As a "backup," she texted Sgt. Michvech and said, "I got a flat tire, I can't make it in." (Anselmo Dep. 192:6–10.) Sgt. Michvech responded, "oh, they told me you called out sick so I have to sick check you." (Id. at 102:11–12.) While Plaintiff was on the phone with Sgt. Michvech, Plaintiff's daughter heard knocking on the door but saw no one when she answered. (Id. at 191:13–21.) The officer who conducted the sick check reported that Plaintiff did not answer the door. (DSUF ¶ 102; PC ¶ 102.)

When Plaintiff arrived at work the next day, Sgt. Michvech informed her that Captain Burgmann wanted to see her because she "blew a sick check." (Anselmo Dep. 196:2–8.) Plaintiff described her interaction with Captain Burgmann:

> I said I told your supervisor that I had a car issue, my tire was flat, I had no way to get to work, I needed to get it repaired. Then he said why didn't you just go to the corner and get a tire. I said the corner and get a tire? What corner was I going to get a tire from? And he said well, you could have just gotten a tire.
>
> I said I have a warranty on my vehicle for tires and I'd rather pay $50 than 500 for a tire so I had [to] wait for the dealership or whatever, and then he starts to have an off topic conversation with Sergeant Michvech. He said do you have a warranty for your tires? That's expensive. And I'm just sitting there and then he says where did you have

> to go get your tire fixed?  I said I had to drive an hour away and I said it's
> not really an hour, but because I was on run flat, I had to go a certain
> speed.  He said why are you telling me you had to drive an hour away?  I
> said well, you just asked me.
>
> He said, well, you blew a sick check and I'm going to have to see
> what I'm going to do about this.  I said, captain, with all due respect, I did
> not blow a sick check.  I told your supervisors I had an emergency, they
> told me I had to take off sick.  I was not sick.
>
> I even told Sergeant Michvech I was going to get my tire fixed
> and I will give you the details of the dealership where I am, which I did
> give her the information.  He went on again, you blew a sick check and
> I'm going to have to penalize you and everything.
>
> At that point Sergeant Michvech said, well, you know, if it was
> an emergency—because Sergeant McEntee, I wasn't here when she called
> in, but Brian [Detective Meissler] had a similar situation, I gave him half
> vacation and half sick.

(Id. at 196:9-197:22.)  Plaintiff testified that she was fearful of being disciplined and felt like she needed

representation because Captain Burgmann belittled her situation.  (Id. at 207:11–208:4.)

Captain Burgmann testified that the sick check was policy and Plaintiff had blown it by not being

home when the supervisor arrived.  (Burgmann Dep. 43:16–19.)  He intended to give her a written

warning for missing this sick check.  (Id. at 43:20–24.)  He also explained, however, that he was not

"privy to what had transpired when she got the flat tire.  [He] didn't realize that until after she came in

[his] office."  (Id. at 44:9–13.)  He explained that she was carried as "sick" instead of vacation because

she had court that day, which precludes vacation time.  (Id. at 44:15–20.)  Ultimately, when he realized

the situation, he "did not give her a written warning at all, [he] just let it go."  (Id. at 45:24–46:2.)  He

remarked that the supervisors "shouldn't have done it, they shouldn't have carried her.  She should have

got her tire fixed and gone to court."  (Id. at 46:3–5.)

### H.  Eagles Superbowl Parade, February 2018

Following the Philadelphia Eagles' Superbowl win in February 2018, there was speculation that

PPD officers would be required to work the parade detail.  The parade was planned for February 8, 2018,

which was Plaintiff's regular day off.  She had already scheduled a medical appointment for a four-to-eight-hour infusion on that day.  (DSUF ¶¶ 109–110, 112; PC ¶¶ 109–110, 112.)

Prior knowing for certain whether she would have to work, Plaintiff called the Fraternal Order of Police ("FOP") for advice so that she could "stay on top" of the situation and avoid the problems she had with the New Year's parade.  The FOP told her to write a memo.  (Id. at 199:19–200:6; 201:7–11.)  Accordingly, on February 5, 2018, Plaintiff drafted the following memo:

> 1.     In anticipation of my RDO [regular day off] being cancelled on Thursday, 2-8-19, I regret to inform you that I will be unable to work that day due to a previously scheduled medical appointment.
>
> 2.     This appointment, which was scheduled on my RDO as to not interfere with my work schedule, was made well in advance and cannot be delayed or rescheduled without potential impact on my health.
>
> 3.     Your consideration in this matter is greatly appreciated.  Thank you in advance.

(Defs.' Mot. Summ. J. O.)  Plaintiff did not explain to anyone that she needed to get an infusion, which is why she could not work the parade.  (Anselmo Dep. 201:22–202:6.)

Upon receipt of the memo, Sgt. Michvech asked Plaintiff if she could move her appointment, and Plaintiff responded that "[t]he City doesn't care if I die, or live or die."  (Michvech Dep. 33:5–9.)  Sgt. Michvech marked the memo as "disapproved," gave Plaintiff a copy, and sent the original up the chain of command.  (Id. at 30:11–20.)  Sgt. Michvech explained that the memo was disapproved because the City had been sending out notices from October to November stating that if the Eagles went into the Super Bowl, no one would be permitted to have off.  (Id. at 30:22–31:8.)

The following day, Captain Burgmann received this memo[4] and was told that Sgt. Michvech had already disapproved it.  Captain Burgmann notified his Inspector—Jim Smith—and made him aware of

---

[4]     In discussing these events, Plaintiff repeatedly refers to a "timeline" attached to her Response as Exhibit C.  This timeline is unsigned and undated.  While an unsworn statement may be considered on summary judgment, an unsworn statement that has not been made under penalty of perjury cannot. United States ex rel. Doe v. Heart Solution, PC, 923 F.3d 308, 315 (3d Cir. 2019).  Because Plaintiff's declaration does not attest to the truthfulness of the assertions contained therein, subject to the penalty of perjury, it is not a competent form of evidence on which may rely in its disposition of the pending motion for summary judgment. See Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005); see

the situation.  Smith advised him that a message was sent out way in advance that days off might be canceled due to the parade.  Smith recommended that the Captain call Plaintiff into his office, make her aware of this policy, and tell her that if she did not show up, she would be facing disciplinary action.  Captain Burgmann testified that there can be exceptions to the policy for serious medical issues, and he was not aware that Plaintiff was getting an MS infusion. (Burgmann Dep. 54:17–19, 56:1–57:22.)

Given this guidance, Captain Burgmann instructed Sgt. Michvech to tell Plaintiff that he wanted to meet with her.  Plaintiff refused and stated that she wanted to call the FOP to have a representative present.  According to Sgt. Michvech, she conveyed this message to the Captain and then returned to Plaintiff to tell her that (a) this was not a disciplinary meeting, (b) the Captain just wanted to talk to her about the memo, and (c) she did not need to call the FOP.  When Captain Burgmann came out, he said "You don't need to call them.  I just want to talk to you," but Plaintiff apparently made a "scene" about it in the office.  (Michvech Dep. 41:16–43:7; Massey Dep. 15:14–16:9.)

Plaintiff described the incident as follows:

> [Sgt. Michvech] told me—I was standing at the fax machine faxing something and she said oh, Denise, the captain wants to meet with you in the office.  I said, oh, sergeant, can you or the captain call FOP so I can have representation?  She was like okay, and then she walked off.  And then she came back and I think I was still faxing something or I was trying to call the FOP myself and then she came back and said—her attitude was different.

> She came back and said you're disobeying a direct order.  The captain said you're disobeying a direct order.  I said I'm not.  I just want to call for FOP representation.  She said the captain said get in there now or whatever, and to me that's not a direct order because he did not give the order.  It's coming through you and I wanted to call for representation which I know that was my right.

> So she storms out and I'm on the phone calling FOP so they could come down there and then he's telling me how to go over radio and get a rep.  He's like here, there should be one in your area and so by that time, the captain, Lieutenant Lloyd and Sergeant Michvech, they surrounded my area and the room is filled with a bunch of detectives, I think it was

---

also <u>Phillis v. Harrisburg Sch. Dist.</u>, 430 F.  App'x 118, 122 (3d Cir. 2011).  Notably, including the declaration as part of the summary judgment record would not change my ultimate disposition of Plaintiff's claims.

like a layover, he storms in and he points his finger and says give me that phone. And I found it surprised, I'm like—the first thing I'm thinking is you got a search warrant for my phone and I was like my phone? He's like you better hang that phone up right now. I'm just shocked. I'm like I'm calling for a rep. He's like hang up that phone, I'm telling you right now, you better hang up that phone.

Now the person on the other is like what's going on? What's going on? I said the captain is telling me to come into his office. I'm trying to get a rep. I don't feel safe going in the office. And he says listen, just go in the office. Don't say anything. Just go in the office. So I'm still trying to listen to both conversations, but the whole time the captain is like I'm telling you you better get up now, you better get up now, but I'm still on the phone. I'm like captain, I'm trying to call for representation because I was afraid.

(Anselmo Dep. 208:11–210:5.)

At that point, Plaintiff went into the office and sat down with Captain Burgmann, Lieutenant Lloyd, and Sergeant Michvech. The Captain said that he cannot have his officers disrespecting him and "you're lucky I didn't discipline you the first time [for the flat tire]. I told you it wasn't for discipline. When I say it's not for discipline, you're supposed to get up and come into the office." (Id. at 211:4–14.) Although Plaintiff tried to explain that she had a serious medical appointment, Captain Burgmann was dismissive and reiterated that she could not take off for the parade detail. Plaintiff did not tell him what the serious medical appointment was—she just figured that Lieutenant Smith would have told him that she had MS. (Id. at 212:17–213:7.) She then said she had an appointment "that's detrimental to my health," and he responded that he did not care about her appointment. By the time the meeting was over, Plaintiff ran out of the office crying and got in touch with the FOP representative. (Id. at 213:8–213:15.)

Ultimately, Plaintiff did not have to work the Eagles parade. She spoke with an FOP disability officer, who relayed the situation to the deputy commissioner. The day after the meeting with Captain Burgmann, the deputy commissioner overruled the leave denial and informed Captain Burgmann that Plaintiff need not attend the detail. (Anselmo Dep. 218:9–15; Burgmann Dep. 74:24–75:3.) Captain Burgmann still did not know why and did not recall even then of being aware of Plaintiff's medical condition. (Burgmann Dep. 75:4–11.) He testified that "if [he] was aware that it was for an infusion, [he] would have allowed her to do it and gone to bat for her to get it done." (Id. at 76:4–6.)

I.      **Plaintiff's Transfer to the Gun Permits Unit**

In April 2018, Plaintiff's husband wrote to the Deputy Commissioner Dennis Wilson requesting her transfer.  Pleading with the Deputy Commissioner, her husband stated, "I don't care where you put her."  (DSUF ¶¶ 136–137; PC ¶¶ 136–137; Defs.' Mot. Summ. J., Ex. I.)  Plaintiff was immediately detailed to the Gun Permits Unit.  As a result, Plaintiff lost overtime opportunities, but Plaintiff "knew that it would affect [overtime] because there's straight work.  There's no overtime at all."  (DSUF ¶¶ 138–139; PC ¶¶ 139–139; Anselmo Dep. 231:20–21.)

Just prior to being transferred, Plaintiff filed for intermittent FMLA.  Although she was approved, she believed that Captain Burgmann delayed approval of that request.  (<u>Id.</u> at 224:2–4, 18–20.)  Captain Burgmann, however, testified:

> I went down to see personnel since they are the experts on family medical leave of absence, especially intermittent, because I was not familiar with it and neither was anyone else in the unit.
>
> I inquired with them what exactly that meant.  I asked, does that mean she can take off for weeks or months at a time or day-to-day?  And they told me it was day-to-day.
>
> I also asked them if a detail came up, was she allowed to take off.  They said, yes, she was.
>
> I also asked them, am I required to get anything else from her, like, from her doctors?  They said, no, that's all submitted here.  We take care of all that it's just a memo from you.
>
> Then they told me exactly what they needed on—specifically on the memo, which I returned to my unit and later provided to [Plaintiff's] supervisors as an exemplar that she should submit for the family medical leave of absence.
> . . .
> I still—at this point in time, I still hadn't really found out exactly what [her medical condition] was.  I knew she was applying for intermittent family medical leave.  I don't recall finding out at that point in time.
>
> But, yeah, if she needed to take off for treatment, she would be afforded the same opportunity as anyone else that was suffering like this.  We would never deny any medical treatment or time to get that medical treatment.

(Burgmann Dep. 79:8–80:15.)

When Plaintiff was transferred, she had approximately twenty-five outstanding investigations that needed to be completed.  Most were reassigned to other individuals in the unit, but there were about five for which Plaintiff needed to complete paperwork.  (DSUF ¶¶ 143–45; PC ¶¶ 143–45; Burgmann Dep. 85:21–86:4; McEntee Dep. 43:5–9.)  Plaintiff was not required to do any further investigations, but rather just to document in the report exactly what she had done so far.  (Burgmann Dep. 86:5–8.)

Sgt. Audrey Carter-Smith testified that Sgt. McEntee contacted her to discuss Plaintiff's outstanding duties.  He indicated that it would not be safe for Plaintiff to come to SVU to complete her work.  (Defs.' Mot. Summ. J., Ex. R., Dep. of Audrey Carter-Smith ("Carter-Smith Dep."), 11:11–17.) Sgt. McEntee stated that he used the words "not smart," explaining that Plaintiff had a habit of saying things under her breath, having an attitude, and not getting along with her supervisors.  (McEntee Dep. 43:20–22.)  He was trying to prevent Plaintiff from coming in and being "triggered and hav[ing] an incident."  (Id. at 44:2–7.)

Sgt. Carter-Smith accompanied Plaintiff to SVU and sat about three feet away from her while she completed her work.  They stayed there for approximately thirty minutes.  At some point she noticed a gentleman, who she later identified as Captain Burgmann, "scout[ing] [Plaintiff] out" and approaching her in a seemingly adverse manner.  He stared at her for a few and then walked away.  (Carter-Smith Dep. 14:3–18:8.)  Since that day, Plaintiff has had no other contact with Captain Burgmann or Sgt. Michvech.  (DSUF ¶ 153; PC ¶ 153.)

**J.      Procedural History**

On November 29, 2018, Plaintiff filed a Complaint setting forth the following claims:  (1) retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.; (2) violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. for failure to engage in the interactive process; (3) ADA violation for failure to provide a reasonable accommodation; (4) ADA violation for disparate treatment; (5) violation of the Family & Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et seq.; (6) violation of 42 U.S.C. § 1983; (7) discrimination and retaliation in violation of the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Stat. § 951, et seq.,

and (8) discrimination and retaliation in violation of the Philadelphia Fair Practices Ordinance ("PFPO"), Philadelphia Code § 9-1101, et seq.  Following a conference with the Court, Plaintiff agreed to withdraw Count IV (ADA – disparate treatment), Count V (FMLA), and Count VI (§ 1983).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.     DISCUSSION

### A.     Plaintiff's Retaliation Claims Under Title VII, PHRA, and PFP

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

A retaliation claim can take the form of a "traditional" retaliation claim or a hostile work environment retaliation claim. Plaintiff relies on both theories. I address each individually.

### 1.   Traditional Retaliation Claims

To establish a *prima facie* case of retaliation under Title VII,[5] a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995). If the employee establishes this *prima facie* case of retaliation, the familiar McDonnell Douglas approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997). To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

For purposes of their Motion, Defendants do not deny that Plaintiff engaged in protected activity by filing a complaint of discrimination against Lt. Hewitt with the Philadelphia Police Department. They

---

[5]     Title VII, the PHRA, and the Philadelphia Ordinance are interpreted co-extensively. Thompson v. Kellogg's USA, 619 F. App'x 141, 144 n.2 (3d Cir. 2015); Darby v. Temple Univ., 216 F. Supp. 3d 535, 543 (E.D. Pa. 2016). As such, it is appropriate to look to the abundant case law addressing discrimination claims under Title VII to assess Plaintiff's claims under the PHRA, and the Philadelphia Ordinance. Angelini v. U.S. Facilities, Inc., No. 17-4133, 2018 WL 3155995, at *7 (E.D. Pa. June 27, 2018).

contend, however, that the retaliation claim fails because Plaintiff cannot establish either (a) materially adverse employment actions or (b) causation.

a.   Material Adverse Action

Under the second element of the *prima facie* case, the United States Supreme Court has held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 77 (2006) (internal quotations omitted); see also Yarnall v. Phila. Sch. Dist., 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014). This is an objective standard which is judicially administrable. Burlington N., 548 U.S. at 68. "[N]ormally, petty slights, minor annoyances, and simple lack of good manners" will not deter victims of discrimination from complaining to the EEOC. Id. (citing 2 EEOC 1998 Manual § 8, p. 8–13). Rather, a change is materially adverse when it rises to the level of "a termination of employment, a demotion evidence[d] by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation." Raffaele v. Potter, No. 09-3622, 2012 WL 33035, at *4 (E.D. Pa. Jan. 6, 2012) (holding that change in working conditions must be more disruptive than a "mere inconvenience" or an "alteration of job responsibilities." (quotations omitted)).

Here, Plaintiff alleges that after she complained of gender-based discrimination in 2016, she was subject to a litany of adverse actions by Defendants over the next two years. (Pl.'s Opp'n Summ. J. 6–7 (listing actions).) None of these actions meet the objective "materially adverse" standard and, thus cannot support a retaliation claim.

First, Plaintiff alleges that Defendants interfered with her transfer requests in December 2016 and April 2017. Courts have recognized, however, that the refusal to grant a purely lateral transfer does not, by itself, amount to adverse employment action. Fallon v. Meissner, 66 F. App'x 348, 349 (3d Cir. 2003); see also Rosati v. Colello, 94 F. Supp. 3d 704, 715 (E.D. Pa. 2015) ("Nor was [plaintiff's] reassignment

17

to [a lateral police unit] an adverse employment action.  Minor actions, such as lateral transfers and changes of title and reporting relationships, generally do not suffice to constitute adverse employment actions."); Woods v. Salisbury Behavioral Health, Inc., 3 F. Supp. 3d 238, 249–50 (M.D. Pa. 2014) ("Non-selection for a position of employment is not always an adverse employment action.  In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action.").  An employee's subjective preference for a different position is insufficient to establish an adverse employment action.  See Swain v. City of Vineland, 457 F. App'x 107, 110–11 (3d Cir. 2012) (citing Herrnreiter v. Chi. Hous. Auth., 315 F.3d 742, 745 (7th Cir. 2002)); Mitchell v. Vanderbilt Univ., 389 F.3d 177, 183 (6th Cir. 2004) ("a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action.").

Here, aside from Plaintiff's speculation—based purely on hearsay—that Captain Burgmann interfered in her requests for transfer to the Major Crimes Unit and Background Checks Unit,[6] the record is devoid of any evidence supporting this allegation.  But, even assuming that Captain Burgmann denied her transfers to purely lateral positions, such denials do not, as a matter of law, constitute adverse employment actions.

Second, Plaintiff asserts that (1) she was denied an overtime shift during the incident with the New Year's Day parade and (2) lost overtime opportunities due to her transfer to the Gun Permit Unit.

With respect to the New Year's Day event, Plaintiff claims to have lost out on a single day's overtime due to the last-minute schedule change so she could see the PPD doctor for the alleged condition

---

[6]   (See Anselmo Dep. 87:15–89:8, 91:5–20 (when Plaintiff inquired into her transfer to Major Crimes, she heard that Captain Burgmann was holding up her paperwork or just not giving her good reviews); id. at 91:12–16 (when Plaintiff inquired into her transfer to Background Checks, she spoke with now Sergeant Jason Reid, who was friends with the captain at the Background Unit, and he said that the SVU was "holding up her paperwork or they're just not giving good reviews.").)

that precluded her from working the parade.  This isolated incident of loss of one day overtime does not rise to the level of material adversity such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N., 548 U.S. at 68; see also Rivers v. Potter, 05-4868, 2007 WL 4440880, at *7 (D.N.J. Dec. 18, 2007) (declining to find that a single instance of overtime denial qualified as an adverse action because it was too "isolated and insubstantial").  Indeed, Plaintiff identifies no other instance where she was denied overtime during her tenure at SVU.[7]

Plaintiff's loss of overtime claim based on her transfer to the Gun Permit unit similarly does not amount to a material adverse event.  Plaintiff was not forced to transfer from the SVU but rather pleaded for a transfer and accepted it knowing that there would be fewer overtime opportunities.  Although she claims that she would not have transferred but for the work environment, she cannot claim retaliation by transfer where Defendants made no effort to transfer her.  See Alers v. City of Phila., 919 F. Supp. 2d 528, 550 (E.D. Pa. 2013) ("Alers claims fewer overtime opportunities exist in his new department and a concomitant reduction in pay opportunities.  While Alers asserts the transfer was made under duress, he cannot claim retaliation by transfer where Defendants took no employment action to transfer him and instead attempted to deny his transfer.").

Third, Plaintiff cites to various incidents of unfair investigation or discipline, including: (a) Captain Burgmann berating her for taking off during the 2017 New Year's Day parade despite her doctor's note; (b) being forced to submit an "injured on duty" form, even though she was not injured on duty; (c) being sick-checked when she took off for having a flat tire; (d) being prohibited from taking off

---

[7]     Moreover, even if the overtime loss could be deemed material, Plaintiff has not provided any evidence that Defendant's justification for the denial was pretext for retaliation.  As noted above, Plaintiff had emailed the Captain's aide prior to the New Year's parade that she had a condition that precluded her from working that day and stated, "I don't know if it's a herniated disc, sciatic nerve, I don't know what it is."  (Anselmo Dep. 156:5–11.)  Captain Burgmann explained, based on the information he received, Plaintiff was unable to do her job and would need to be cleared by the PPD doctors before returning to work.  (Burgmann Dep. 26:20–27:3.)  Because Plaintiff had to leave her regular evening shift to see the doctor, she did not get overtime for her court appearance that morning.  Plaintiff does not explain how this explanation was simply pretext to retaliate against her for her discrimination complaint.

for the Eagles parade detail when she had a doctor's appointment; and (e) being reprimanded for not following orders when she would not meet with Captain Burgmann regarding the Eagles parade.

As to Plaintiff's "sick-check" claim, it is undisputed that Captain Burgmann acknowledged that the sick-check was supervisory error, and he imposed no discipline on Plaintiff as a result. "The mere initiation of investigation is not an adverse employment action when it has no effect on the plaintiff's employment." Tomaszewski v. City of Phila., No. 17-4675, 2020 WL 2512789, at *13 (E.D. Pa. May 14, 2020) (internal quotation omitted).

Likewise, as to the required injured-on-duty form, courts have generally held that an employer's requests for documentation regarding medical leave do not rise to the level of a material adverse employment action. See id. at *13 (citing Moore v. Napolitano, No. 07-2666, 2010 WL 2671850, at *7 (E.D. La. June 29, 2010) ("[I]n most cases, a reasonably necessary request for medical information is not considered a materially adverse employment action."); Browne v. City Univ of New York, 419 F. Supp. 2d 315, 335 (E.D.N.Y. 2005) (finding that defendant's "requirement that [plaintiff] submit additional medical documentation for an extension of disability leave" does not qualify as materially adverse)).

As to the remainder of the discipline claims, the Third Circuit and courts therein have been hesitant to find adverse employment actions absent a show of harm or injury. For example, in Morrison v. Carpenter Tech. Corp., 193 F. App'x 148 (3d Cir. 2006), the Third Circuit affirmed the district court's finding that the plaintiff, who received a "Corrective Performance Review" for disruptive behavior associated with making a discrimination complaint, had not suffered an adverse employment action because he did not "identify, much less establish, any harm or injury" that resulted from the review, and the review did not result in economic loss, change to the terms of his employment, or impact on his professional advancement. Id. at 154.[8]

---

[8]   See also Atkinson v. N.J. Developmental, 453 F. App'x 262, 263, 266 (3d Cir. 2011) (affirming summary judgment for the employer on a retaliation claim when supervisor gave the plaintiff a low performance review, issued her a warning for arriving late, denied her vacation requests, adjusted her duties, and got into a heated argument with her, particularly where these problems were ultimately resolved without impact on her job); Alers, 919 F. Supp. 2d at 549 (finding that employer's investigation

None of the incidents described by Plaintiff amount to material adverse acts that would dissuade a reasonable employee from making a discrimination complaint.  While Plaintiff undoubtedly suffered some uncomfortable work situations, she has produced no evidence to establish economic loss, termination of employment, demotion, change in title, material loss in benefits, or significantly diminished material responsibilities.  Indeed, after each of these events, Plaintiff simply continued in the same position.  Accordingly, I do not find that such actions satisfy the second prong of her retaliation claim.

Fourth, Plaintiff complains of various slights by her supervisors: (a) Sgt. Michvech told Plaintiff that she was portrayed in an unflattering manner and that it was widely known that she had made a discrimination complaint; (b) after Plaintiff's MS diagnosis in March 2017, Lt. Smith suggested Plaintiff keep it to herself because PPD staff were prone to gossip; (c) in early 2017, Sgt Michvech was dismissive of Plaintiff's concerns that her doctor's advice was not honored and told Plaintiff "you can't call out on a detail"; (d) Sgt Michvech told other office staff that Plaintiff visited the Employee Assistance Program, which is supposed to be confidential; (e) on two other occasions, Sgt Michvech bent the rules for other officers, but did not do the same for Plaintiff; and (f) when Plaintiff returned to the SVU, after her transfer, to complete her reports, Sgt. McEntee warned Sgt. Carter-Smith to tell Plaintiff that it was not safe for Plaintiff to return.

As noted above, the Supreme Court has emphasized that Title VII does not set forth "a general civility code for the American workplace."  Burlington N., 548 U.S. at 68.  "[C]ourts have consistently found that an employee's perception that [she] has been micromanaged, criticized, or scrutinized by

---

into plaintiff's alleged work rule violation or vacation time violation was not adverse employment event where employer failed to demonstrate material injury or harm from investigation or initiation of discipline); Nagle v. RMA, The Risk Mgmt. Assn., 513 F. Supp. 2d 383, 391–92 (E.D. Pa. 2007) (granting summary judgment for employer and holding that meeting wherein employer reprimanded plaintiff for sixty-five minutes, gave a negative review, and threatened plaintiff with loss of employment was not material adverse employment action where the review did not result in economic loss or any change to the terms of his employment, and there was no evidence regarding the significance of a single such review on his professional advancement).

[her] supervisor fails to rise to the level of 'material adversity,' and is not actionable as part of a Title VII retaliation claim." McKinnon v. Gonzales, 642 F. Supp. 2d 410, 428 (D.N.J. 2009) (internal citations omitted).[9]

Fifth, Plaintiff asserts that, in April 2018, Defendant Burgmann delayed Plaintiff's FMLA request. Aside from the fact that the evidence does not establish that Defendant Burgmann engaged in any such delay, "the denial of request for leave alone does not constitute an adverse employment action for purposes of stating a claim for . . . retaliation." Feliciano v. Coca-Cola Refreshments USA, Inc., 281 F. Supp. 3d 585, 594 (E.D. Pa. 2017). Indeed, Plaintiff was not denied leave, but rather was approved for intermittent FMLA leave the same day she was transferred to the Gun Permit Unit. (Anselmo Dep. 223:18–224:4.) Accordingly, I find no adverse employment action.

Finally, Plaintiff asserts that after she transferred out of the SVU unit, "Defendants Michvech and Burgman" continued to harass Plaintiff by forcing Plaintiff to finish assignments in their unit, which was not normal procedure" and required Plaintiff to physically come back to SVU to complete those assignments. (Pl.'s Opp'n Summ. J. 7.) Repeatedly, courts have declined to find that similar actions constitute an adverse employment action. See, e.g., Tomaszewski, 2020 WL 2512789, at *14 (granting summary judgment where plaintiff failed to produce evidence that his workload was increased to the point that it constituted an adverse action); Fitzgerald v. Shore Mem. Hosp., 92 F. Supp. 3d 214, 240–41 (D.N.J. 2015) ("Plaintiff points only to three incidences over the course of six years of employment at

---

[9]     See, e.g., Dicks-Kee v. N.J. Judiciary, No. 12-6620, 2014 WL 7339458, at *8 (D.N.J. Dec. 23, 2014) (finding that the supervisor's treatment of "hostility, condescension, and disrespect," including yelling at her, interrupting her conversations, barging into her office unannounced, and acting dismissively towards her did not rise to the level of material adversity); LaSalle v. Port Auth. of N.Y. & N.J., No. 12-2532, 2013 WL 6094339, at *12 (D.N.J. Nov. 19, 2013) (finding that it was not materially adverse when the plaintiff was "micro-managed" and accused of stealing time, and his supervisor was "condescending and belittling," called the plaintiff a liar, cursed at him, and embarrassed him on at least one occasion, among other things); Blake v. Penn State Univ. Greater Allegheny Campus, No. 09-1182, 2011 WL 841374, at *9 (W.D. Pa. Mar. 8, 2001) (granting summary judgment on plaintiff's allegations that she was subject to monthly disciplinary conferences when she had not violated any rules, was berated in front of her co-workers based on insignificant or non-existent grounds, was burdened with harsh work assignments, and was overly monitored.).

Shore where she received more difficult assignments . . . Such conduct does not establish adverse employment action."). Moreover, Plaintiff does not allege that completion of the reports was beyond her normal job duties. Rather, the evidence is undisputed that when Plaintiff was transferred, she simply needed to complete some paperwork documenting her investigations on five cases, which she was able to do in a span of thirty minutes. Such conduct does not, as a matter of law, constitute adverse employment action.

Ultimately, "[t]he aggregate effect of all retaliatory measures identified by [P]laintiff falls short of providing sufficient probative evidence from which [a] finder of fact can find that [P]laintiff was the victim of a tapestry of retaliatory discrimination." Nolan v. Swartz Campbell, LLC, No. 05-1508, 2008 WL 598291, at *22 (W.D. Pa. Feb. 29, 2008). While Plaintiff may have felt intimidated, belittled, and ostracized, "merely identifying a number of workplace events that make an employee feel uncomfortable is not enough." Id. Rather, "[t]he identified retaliation must be materially adverse from an objective perspective," id., such that it rose to the level of "a termination of employment, a demotion evidence[d] by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices unique to a particular situation." Glanzmann v. Metro. Mgmt. Corp., 290 F. Supp. 2d 571, 582 (E.D. Pa. 2003). Applying this objective standard, I find, as a matter of law, that the actions identified by Plaintiff would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.

### b. Causal Connection

Even assuming that Plaintiff could establish a material adverse employment action, she fails to adduce any evidence to prove causation. "A plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII." Carvalho–Grevious v. Del. State Univ., 851 F.3d 249, 257–58 (3d Cir. 2017) (citing 42 U.S.C. § 2000e-2(m)). "Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Jensen v. Potter, 435 F.3d

444, 449 (3d Cir. 2006).  This third element thus requires that a plaintiff identify "what harassment, if any, a reasonable jury could link to a retaliatory animus." Id. at 449–50.  "The ultimate question in any retaliation case is an intent to retaliate *vel non*." Id. at 449 n. 2.  A plaintiff must prove that the retaliatory animus had a "determinative effect" on the employer's decision to subject the employee to adverse employment action. Woodson v. Scott Paper Co., 109 F.3d 913, 932 (3d Cir. 1997).  "To prove a 'determinative effect,' the plaintiff must show 'by a preponderance of the evidence that there is a "but-for" causal connection' between the adverse employment action and the retaliatory animus." Carvalho–Grevious, 851 F.3d at 258 (quotations omitted).

The court should "consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)).  To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive." Id.; see also Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).  "Days are suggestive, months are not." Rosati v. Colello, 94 F. Supp. 3d 704, 717 (E.D. Pa. 2015).  In the absence of such a close temporal proximity, the court should "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015).  A mere scintilla of evidence is insufficient to survive summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. See LeBoon, 503 F.3d at 232–33.

Here, any temporal proximity between Plaintiff's protected activity and alleged adverse action is lacking.  Plaintiff submitted her discrimination complaint in March 2016.  The first claimed adverse employment action did not occur until nine months later, in December 2016, when she did not receive a transfer to Major Crimes and could not take off for the New Year's parade.  Thereafter, the next potential

adverse event occurred another nine months later, in September 2017, when she was denied another transfer.  Although there is no bright-line rule as to what constitutes unduly suggestive temporal proximity, a gap of nine months between the protected activity and the adverse action, absent other evidence, clearly cannot create an inference of causation and defeat summary judgment.  See LeBoon, 503 F.3d at 233 (finding that gap of three months was too long to establish causation).

Moreover, Plaintiff fails to identify any evidence suggesting that Defendants had a retaliatory animus when taking the alleged adverse actions.  Plaintiff cites to no intervening antagonism by Defendants, inconsistencies in the reasons given for the actions, statements/comments about Plaintiff's discrimination complaint, or any other evidence suggesting that any of the identified employment actions were taken in retaliation for her filing of a discrimination complaint.[10]

As set forth above, the retaliation plaintiff's ultimate burden is to show, by a preponderance of the evidence that there is a "but-for" causal connection between the adverse employment action and the retaliatory animus.  Plaintiff here has put forth no evidence on which a trier of fact could reasonably conclude that retaliatory animus was the but for cause of any of the identified actions by Defendants.

<em>c.     Conclusion as to Plaintiff's Traditional Retaliation Claim</em>

In sum, Plaintiff fails to set forth any genuine issue of material fact to avoid summary judgment in Defendants' favor on her traditional retaliation claim.  The alleged retaliatory actions, taken as true, do not constitute material adverse employment actions on which such a claim can be based.  Moreover, Plaintiff puts forth no evidence from which a reasonable jury could find that retaliatory animus was the

---

[10]     In an effort to avoid this time gap, Plaintiff invokes the continuing violations doctrine.  That doctrine is inapplicable here.  The continuing violations doctrine is an "equitable exception to the timely filing requirement" that applies "when a defendant's conduct is part of a continuing practice." Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted). The doctrine renders an action "timely so long as the last act evidencing the continuing practice falls within the limitations period."  Id.  The doctrine cannot be used—as Plaintiff attempts to do here—to establish causation.

but-for cause of any of the actions identified.[11]   Accordingly, I will grant Defendants' Motion for Summary Judgment on these claims.

2.   Retaliatory Hostile Work Environment Claim

Plaintiff also presses a retaliatory hostile work environment theory.  The United States Supreme Court has explained "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  The usual discriminatory hostile work environment framework applies equally to claims of retaliatory hostile work environment.  Komis v. Sec'y of U.S. Dept. of Labor, 918 F.3d 289, 293 (3d Cir. 2019).  Under that framework, a plaintiff must prove that (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  Id.  In other words, a "severe and pervasive" hostile work environment is substituted in place of a materially adverse employment action.  See Hare v. Potter, 220 F. App'x 120, 131–32 (3d Cir. 2007); Komis v. Perez, No. 11-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014).

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment."  Komis, 2014 WL 3437658, at *2 (quoting Jensen v. Potter, 435 F.2d 444, 450 (3d Cir. 2006)).  "The 'severe and pervasive' element

---

[11]   Defendants also argue that Plaintiff cannot show that their legitimate non-retaliatory reasons for their actions are pretextual.  As I find that Plaintiff has not met her burden to establish a *prima facie* case of retaliation, I need not reach this portion of the burden-shifting analysis.

requires [a plaintiff] to show that her work environment became so abusive because of the discriminatory actions by her supervisors and co-workers that it changed the very nature of her employment." Id. "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Where the hostile work environment is perpetrated by co-workers rather than supervisors, the Third Circuit has made clear that "[a]n employer may be liable under Title VII for retaliatory harassment only if the *prima facie* case is satisfied and if there is a basis for employer liability for the co-worker's conduct." Moore v. City of Phil., 461 F.3d 331, 349 (3d Cir. 2006). "There is such a basis for liability where supervisors 'knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action' to stop the abuse." Id. (quotation omitted).

Here, Plaintiff claims that the hostile work environment was perpetrated by her co-workers. Plaintiff avers that as a result of her internal complaint, she was ostracized, she lost friends at work, she was not invited to social gatherings and conversations, co-workers would not sit near her, she was excluded when lunch was being ordered, and none of her co-workers would investigate her cases with her. (DSUF ¶¶ 22–26; PR ¶¶ 22–26.) One of her co-workers would say "rat" while bantering with other detectives near her, which Plaintiff "assumed" had something to do with her. (Anselmo Dep. 72:1–21.)

Taking the facts in the light most favorable to Plaintiff, and assuming that such events can be deemed to rise to the level of a severe and pervasive retaliatory work environment, Plaintiff's claim fails because she has produced no evidence that Defendants knew of the harassment and failed to stop it. Plaintiff does not allege that Defendants encouraged, condoned, or even knew of these activities. In fact, Plaintiff explicitly admits that she did not report any of these allegations to anyone and responded by simply "withdraw[ing]." (DSUF ¶¶ 27–28; PR ¶¶ 27–28; Anselmo Dep. 78:6—20.) Because she was

tired of the bullying, she kept to herself and typically "worked with [her] Air Buds on." ("Anselmo Aff.") ¶ 6.) While Plaintiff's co-workers may have disapproved of Plaintiff's internal complaint and ostracized her as a means of voicing their objection, such actions cannot, without more, be imputed to Defendants. Accordingly, I will grant Defendants' Motion for Summary Judgment on this claim.

**B.**     **ADA Claims**

Plaintiff also asserts a failure to accommodation claim under the ADA.  An employee commits unlawful disability discrimination under the ADA if he/she "does not mak[e] reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A);  Gaul v. Lucent Tech. Inc., 134 F.3d 576, 579 (3d Cir. 1998) (brackets in original); see also Colwell v. Rite Aid Corp., 602 F.3d 495, 504–05 (3d Cir. 2010) (noting that "[u]nder the ADA, an employer discriminates against an employee by not making 'reasonable accommodations'" under certain circumstances)); Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 186 (3d Cir.2009) (describing elements a plaintiff must prove "for a covered entity to be found liable for discrimination on the basis of failure to accommodate").  In order to establish a *prima facie* case of disparate treatment under the ADA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (citing Gaul, 134 F.3d at 580).

For purposes of this Motion, Defendants do not dispute that Plaintiff is disabled (prong one) or otherwise qualified to perform the essential functions of her job (prong two), but claim that Plaintiff has not produced any evidence as to the existence of an adverse employment decision resulting from discrimination. (prong three).

Discrimination under the third prong of a prima facie case under the ADA "includes failing to make reasonable accommodations for plaintiff's disabilities." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). An employer and employee both "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 771–72 (3d Cir.2004) (citing Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir.1997)). "An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Hofacker v. Wells Fargo Bank Nat'l Ass'n, 179 F. Supp. 3d 463, 469 (E.D. Pa. 2016) (quotations omitted).

Plaintiff claims that Defendants violated the ADA by failing to engage in the interactive process and accommodate her disability both with respect to the 2017 New Year's Day parade detail and the 2018 Eagles parade detail. Defendants respond that Plaintiff has failed to meet its summary judgment burden on either of these theories.

1.     The 2017 New Year's Day Parade Detail

Defendants first argue that to the extent that Plaintiff's ADA claim relies on the 2017 New Year's Day parade, her claim fails because she is unable to establish that Defendants knew of her disability at the relevant time. I agree.

An employee triggers the employer's duty to engage in the interactive process when the employee presents information to her employer that she might have such a "disability." Taylor v. Phoenixville School Dist., 184 F.3d 296, 313–14 (3d Cir. 1999). "Employers cannot assume employees are disabled and need accommodations," and, therefore, employees carry the initial burden of providing notice and asking for help. Taylor, 184 F.3d at 313. "Although an employer is liable for discriminating against an

employee in need of accommodation based upon the employee's *known* disability, neither the law nor common sense can demand clairvoyance of an employer."  Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 331 (3d Cir. 2003) (emphasis in original); see also 42 U.S.C. § 12112(b)(5)(A) (requiring only reasonable accommodations to "known" disability); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996) (noting initial duty of employee to inform employer of disability is dictated by "common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate."); Punt v. Kelly Servs., 862 F.3d 1040, 1048 (10th Cir. 2017) (holding that for the ADA to be violated, the employee must provide to the employer notice of the disability, any limitations which result therefrom, and the accommodations he or she wishes to receive); Isley v. Aker Phila. Shipyard, Inc., 275 F. Supp. 3d 620, 630 (E.D. Pa. 2017) (noting that where employer had no knowledge that employee suffered from health problems that interfered with his work and had not observed a decline in employee's job performance that might have suggested that something was wrong, employer had no reason to assume that employee's visit to the E.R. was for anything other than a one-time bought of chest pain—something that, by itself, would not constitute a "disability.").

Importantly, a "disability" under the ADA is not a temporary, non-chronic injury or condition, but rather is defined as (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such impairment;" or (3) "being regarded as having such impairment."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002) (quoting 42 U.S.C. § 120102(2))).  Thus, notice of a simple injury or temporary condition does not invoke the protections of the ADA.  Id.

Here, it is undisputed that Defendants did not know about Plaintiff's MS, or any other "disability" as defined by the ADA, during the time period relevant to the 2017 New Year's Day parade.  Plaintiff admitted that she was not diagnosed with MS until March 2017.  Although she had been experiencing tingling in her feet and numbness and muscle weakness in her legs in the months prior to the parade, Plaintiff stated that worked through the symptoms and that her attendance  and performance at work was unaffected.  She made only casual mention to Sergeant Vessay, that she had burning in her feet.

Following a medical appointment on December 30, 2017, Plaintiff provided one of her supervisors with a doctor's note that stated, "[Plaintiff] was seen today.  She may be excused from full duty 1/1/2017.  She may return to work 1/3/16 [sic] without restrictions."  (Pl.'s Sur-reply, Ex. M.)  On the eve of the parade, Plaintiff then emailed Captain Burgmann's aide and told him, in her words, "I don't think I'm going to be able to do the detail or whatever, maybe you can get somebody to fill it out.  I don't know what's going on.  I've been checking on YouTube.  I don't know if it's a herniated disc, sciatic nerve, I don't know what it is, but I'm going to go to my other doctor, I have another doctor appointment and I will provide a note."  (Anselmo Dep. 156:3–12.)  Ultimately, Plaintiff used sick leave and did not work the parade detail.  When Plaintiff returned to work, Captain Burgmann ordered her to see the police doctor because Plaintiff claimed to have an injury of some kind.  Plaintiff admitted that she told Captain Burgmann that she did not know what she had.

Based on this evidence, I cannot find any genuine issue of material fact regarding whether Defendants had knowledge of her disability such that it was required to engage in the interactive process and accommodate her disability.  Plaintiff's vague complaints accompanied by a subsequent email that she could not work parade detail did not provide enough information for Defendants to recognize that she had a "disability" that required an accommodation.  Likewise, the doctor's note that Plaintiff should be excused from work on the day of the parade but could return to work two days later "without restrictions," was insufficient to put Defendants on notice of any disability.  At best, this evidence suggested that Plaintiff was injured in some way, which does not constitute a "disability" protected by the ADA.  Without some sort of understanding of the nature of Plaintiff's disability, Defendants could not reasonably be expected to know that an appropriate accommodation was required.  Accordingly, I will grant summary judgment in Defendant's favor on this portion of Plaintiff's ADA claim.

2.      The 2018 Eagles Parade Detail

Plaintiff also brings an ADA claim based on the events surrounding the 2018 Eagles Parade detail. Defendants argue that they are entitled to summary judgment because, even assuming that they timely

knew of Plaintiff's disability and request for reasonable accommodation, the City actually engaged in an interactive process and accommodated Plaintiff's request.

The ADA's regulations make clear that the purpose of the interactive process is to determine the appropriate accommodations: "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). "[T]he process must be interactive because each party holds information the other does not have or cannot easily obtain." Taylor, 184 F.3d at 316. "[A]n employer has no requirement to provide an employee the exact accommodation they want; rather, '[a]ll the interactive process requires is that employers make a good-faith effort to seek accommodations.'" Hofacker v. Wells Fargo Bank Nat'l Assn., 179 F. Supp. 3d 463, 469 (E.D. Pa. 2016) (quoting Kortyna v. Lafayette Coll., 47 F. Supp. 3d 225, 242 (E.D. Pa. 2014) (quoting Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 187 (3d Cir. 2009))). "Employers . . . can demonstrate that they participated in the interactive process in good faith by showing, for example, that they met with the employee who requested the accommodation, that they requested information about the employee's condition and limitations, they asked the employee what accommodation she desired, they considered the employee's request, and they discussed alternative accommodations if the requested accommodation was too burdensome." Mills v. Temple Univ., 869 F. Supp. 2d 609, 624 (E.D. Pa. 2012); see also Stadtmiller v. UPMC Health Plan, Inc., 491 F. App'x 334 (3d Cir. 2012) (affirming grant of summary judgment where court could "confidently conclude as a matter of law" that defendant made a good faith effort to engage in interactive process even though it was ultimately unable to accommodate him). The question of reasonableness is "one that is determined when *both* parties engage in the interactive process to find accommodations." Kortyna, 47 F. Supp. 3d 225, 240 n.50 (emphasis in original). A plaintiff's decision to sue rather than respond to proposed accommodations precludes an ADA claim. Hofacker, 179 F. Supp. 3d at 471–72 (citing cases).

Here, taking all facts in the light most favorable to Plaintiff, I conclude that no reasonable juror could find that Defendants failed to engage in the interactive process and provide a reasonable

accommodation.  All of the events in question occurred over a span of two days.  On February 6, 2018, Plaintiff provided a memo to her supervisor, Sgt Michvech, stating that she had a previously-scheduled medical appointment for that day and could not reschedule it "without potential impact on [her] health." (Defs.' Mot. Summ. J. O.)  That memo did not relay that she had a disability of any kind or specify that her appointment was related to any disability.  When Sgt. Michvech received it and asked if Plaintiff could reschedule, Plaintiff responded that "[t]he City doesn't care if I die, or live or die."  (Michvech Dep. 33:5–9.)  Plaintiff again admitted that she never told anyone that day that her medical appointment was for an infusion, only that she "needed to keep [her] medical appointment."  (Anselmo Dep. 202:2–19.)  Sgt. Michvech "disapproved" Plaintiff's leave because all officers had to work parade details. Notably, however, Sgt Michvech "didn't have the final say on whether it was approved or disapproved." (Michvech Dep. 37:12–15.)  Consistent with that policy, Plaintiff was given a copy and the original was sent up the chain of command.

The following day, when Captain Burgmann received Plaintiff's memo, he called Plaintiff into his office to discuss it.  Plaintiff refused to go into the meeting without having an FOP representative present and, as such, again failed to communicate that her medical appointment was related to a disability. Captain Burgmann then denied her leave to take off during the parade. The very next day, Plaintiff explained to an FOP disability officer that she had MS.  The disability officer spoke to the PPD deputy commissioner, who overruled the leave denial and informed Captain Burgmann that Plaintiff was not required to attend the detail.  By all accounts, Captain Burgmann still did not know why and did not recall even then of being aware of Plaintiff's medical condition.

Although the interactive process here was unnecessarily belabored and irrationally contentious, it undoubtedly occurred.  Plaintiff requested an accommodation for a medical appointment without—by her own admission—ever informing anyone that the medical appointment was directly related to her MS or any other "disability."  Although the request was originally denied, that decision was not final and the interactive process continued through Captain Burgmann.  In lieu of taking the opportunity to

communicate her needs, Plaintiff demanded FOP representation.  At that point, Plaintiff had still not provided sufficient information—or even given anyone an opportunity to inquire about information—in order to engage in a rational discussion about whether an accommodation for a disability was needed and what accommodation would be appropriate.  Only after she contacted the FOP disability officer did Plaintiff finally reveal the requisite details, resulting in the City's provision of the exact accommodation she requested.  In short, it was Plaintiff, not Defendants, who declined to participate in good faith in the interactive process.  On this record, no trier of fact can find that Defendants failed to make a good faith effort to accommodate her.  Accordingly, I will grant Defendants' Motion for Summary Judgment on this claim.

## IV.    CONCLUSION

For all of the foregoing reasons, I will grant summary judgment in favor of Defendants on the entirety of Plaintiff's Complaint and will dismiss this case with prejudice.  An appropriate Order follows.